IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Boater's Emergency Service, LLC,

                 Plaintiff,

       -vs-

Archon Hat 80, LLC, et al.,

                Defendants.

Case No. 3:21 CV 2047

<u>MEMORANDUM OPINION</u>

JUDGE JACK ZOUHARY

## INTRODUCTION

Defendant Joseph Sebring, through his Company Archon Hat 80, LLC, owned the *JudeSea* -- a 75-foot yacht worth $1.1 million (Doc. 53 at 1).  In September 2021, the yacht sank after losing power on Lake Erie.  An expensive marine-salvage operation ensued.

This Court must decide whether the loss is covered by the insurance policy issued by Defendant ACE American Insurance Company.  The parties filed dueling Motions for Summary Judgment (Docs. 54, 56), appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Federal Civil Rule 56(a).  The matter is fully briefed (Docs. 53, 54, 56, 59), and this Court heard oral argument (Doc. 62).

## BACKGROUND

In 2017, Sebring purchased a marine-insurance policy ("Policy") from ACE through broker Defendants Rick Bersnak and the Keenan Agency (Doc. 53-2 at 9).  He renewed it each year through 2021 (Doc. 57-1 at 197).

Under the Policy, ACE "agree[d] to provide the insurance described in this marine insurance policy in return for [Sebring's] premium, compliance with the policy conditions, and adherence to representations described in all correspondence, documentation, or information provided to [ACE]

by [Sebring's] agent or broker" (Doc. 53-2 at 11).  The Policy covered "all risk of physical loss to [Sebring's] insured vessel or other property covered under this part of [his] Masterpiece Policy, unless stated otherwise or an exclusion applie[d]" (*id.* at 14).  The Policy contained two endorsements.  The first was a Navigation Warranty, restricting the *JudeSea* to the Great Lakes and Atlantic Coast (*id.* at 41).  The second was a Captain's Warranty, stating that "a condition of this [P]olicy that the named insured vessel, while being navigated, is under the care, custody, and control of the captain shown below" (*id.* at 42).  Captain Jay Franklin was named in the endorsement (*id.*).  In order to obtain the Policy, Sebring signed an underwriting "worksheet," which asked if the named captain had "any previous loss history" (Doc. 56-2 at 16).  The worksheet not only stated that the coverage was based on the information provided, but also that the issuance of the Policy was subject to receipt and approval of crew resumes (*id.* at 14–17).  And although Sebring does not recall providing Franklin's resume, it was present in ACE's file (Doc. 57-1 at 66–67).

Captain Franklin navigated the boat for several seasons before falling ill in early 2021 (Doc. 57-1 at 50).  Sebring then replaced Captain Franklin with Captain Jim Dale.  Sebring did not, however, notify ACE or Bersnak to update the Policy (*id.* at 55).

On September 11, 2021, Sebring and his friends were on board the *JudeSea*, sailing Lake Erie off the coast of Middle Bass Island (Doc. 53 at 1).  Captain Dale was at the helm.  After several minutes, the *JudeSea*'s engines began to fail (Doc. 57-1 at 138).  One of the two main engines "started sputtering" and, moments later, the second did the same (*id.*).  Within minutes, both engines turned off (*id.*).  Sebring instructed Dale to go below deck to attempt to diagnose the problem (*id.*).  Dale tried priming the engines in an effort to restart them (*id.* at 179).  No luck.  As the vessel neared shore, Sebring attempted to stop the drift by dropping the anchor (*id.* at 138–39).

2

However, Sebring was unaware that the *JudeSea* was floating above a rock ledge, so the anchor never caught (*id.* at 139).

Adrift and powerless, the *JudeSea* crashed into a jetty and began to sink. Boater's Emergency Services removed the partially sunk vessel from the water and moved it to a haul-out facility to mitigate any further damage (Doc. 54-1). The salvage-operation invoice totaled $491,577.69 (*id.*). After receiving the invoice, Sebring submitted a claim for coverage under the Policy. ACE responded with a denial letter, noting that the "Warranty Endorsement . . . lists Jay Franklin as the named captain" (Doc. 53-4 at 2–3). And because "Jay Franklin was not aboard the vessel during this voyage . . . the loss is not covered under the policy due to the fact that [he] was not in the Care, Custody, and Control of the vessel at the time of the loss" (*id.* at 3).

Following the denial, Boater's Emergency filed suit against Sebring, Bersnak, and ACE (Doc. 1). Boater's Emergency settled its claims and was dismissed from this case (Doc. 34).

## DISCUSSION

### *Choice of Law*

As a threshold issue, the parties dispute whether state or federal law applies. ACE argues federal maritime law covers this dispute (Doc. 56 at 11); Sebring asserts Ohio law applies (Doc. 54 at 14–17). The Policy's choice-of-law provision reads (Doc. 53-2 at 32):

> This [P]olicy shall be construed in accordance with General Maritime Law or Admiralty Rule. If no General Maritime Law or Admiralty Rule applies, the law of the State appearing in your address as contained upon the Declarations Page will apply without regard to the conflict of laws or provisions thereof.

ACE cites to *Home Insurance Co. v. Ciconett*, 179 F.2d 892 (6th Cir. 1950), asserting the Sixth Circuit "has specifically held that the federal admiralty law applies in the context of a crew warranty endorsement in a policy of marine insurance" (Doc. 56 at 12). In that case, a maritime-

3

insurance contract required a watchman onboard.  179 F.2d at 893–94.  The Sixth Circuit applied federal maritime law, as opposed to state law, to evaluate the contract, and held that the warranty violation voided coverage.  *Id.* at 894.

Sebring counters with *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, where the insurance company denied liability because of a warranty "providing that, without written consent of the company, the boat could not be sold, transferred, assigned, pledged, hired or chartered, and must be used solely for private pleasure purposes."  348 U.S. 310, 311 (1955).  The Fifth Circuit upheld the district court, which applied federal maritime law, and found in favor of the insurance company because "there is an established admiralty rule which requires literal fulfillment of every policy warranty so that any breach bars recovery, even though a loss would have happened had the warranty been carried out to the letter."  *Id.* at 312–13.  But the Supreme Court overturned the lower courts, finding that in the context of maritime insurance, state law applies unless there is some "judicially established federal admiralty rule."  *Id.* at 314.  And because there was no established federal admiralty rule "requiring strict fulfillment of maritime insurance warranties," state law applied.  *Id.* at 314–16.

In short, *Wilburn Boat* established the principle that state law governs marine insurance contracts in cases where there is no conflicting federal statute or established federal admiralty rule.  Though the Court did not explicitly overrule *Ciconett*, it cited the case disapprovingly: "There are very few federal cases on marine insurance in which the strict breach of warranty rule has even been considered.  And only two circuits *appear to have thought* of the rule as a part of the general admiralty law."  *Id.* at 315 (emphasis added).  Thus, it remains unclear whether a Sixth Circuit rule governs the issue.  This Court therefore looks to Ohio law, as outlined by the Policy.  *See Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 996 F.3d 1161, 1169 (11th Cir. 2021) (applying

state law to maritime warranty because the court "found no American cases or authorities recognizing or announcing an entrenched maritime rule"). *See also J-Way Southern, Inc. v. River Rd. Constr., Inc.*, 2018 WL 1182507, at *9–10 (N.D. Ohio 2018) (applying the state law listed in choice-of-law provision in a maritime contract).

### *"Being Navigated"*

Under Ohio law, "[a]n insurance policy is a contract; in interpreting contracts, courts must give effect to the intent of the parties, and that intent is presumed to be reflected in the plain and ordinary meaning of the contract language." *Smith v. Erie Ins. Co.*, 148 Ohio St. 3d 192, 197 (Ohio 2016) (citation omitted). This Court must "examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy." *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (Ohio 2003). This Court "look[s] to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *First Energy Generation, LLC v. Valley Forge Ins. Co.*, 487 F. Supp. 3d 630, 634 (N.D. Ohio 2020) (citation omitted). "[W]hen the language of a policy is clear, a court may look no further than the writing itself to find the intent of the parties." *Id.*

Sebring admits the Captain's Warranty "applied while the *JudeSea* was 'being navigated,'" but argues it is "irrelevant . . . who was operating the vessel prior to the loss, because at the time of the loss, the vessel was not being navigated" (Doc. 59 at 8). From his perspective, the *JudeSea* was not "being navigated" because its "engines had failed and [] it was adrift at the time of the loss" (*id.* at 8–9). Sebring's theory is that the vessel was being navigated when it left the dock, and during the entire time while out on the Lake, that is, until the moment the engines failed. But this theory leads to an absurd result -- had they successfully restored power to the engines, would those aboard have begun navigating again instantaneously?

5

This Court finds the Policy clear and unambiguous.  When the parties signed the contract, they intended for Captain Franklin to be at the helm of the *JudeSea* whenever it sailed from the dock.  The only reasonable interpretation of the Captain's Warranty is that the vessel was "being navigated" during its entire voyage -- from the time it departed the dock to the moment it allided with the jetty.  This conclusion is further bolstered by common sense.  When a vessel leaves the dock, it is being navigated until it returns to the dock or reaches another temporary or intended destination.

### *Expert Testimony*

Under Ohio law, "[e]xtrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning."  *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313–14 (Ohio 1996).  Sebring argues that the term is ambiguous, and should be construed in his favor (Doc. 54 at 18–21).  The Policy is not ambiguous.  But, even if the term was ambiguous -- which might allow this Court to consider expert testimony -- the result remains the same.

Sebring's expert, Eric Peace, testified that the vessel was not "being navigated" at the moment the engines failed (Doc. 58-1 at 56–57):

> Q:    So in your view, the way you characterize navigation, that vessel is navigating up to the point where she loses both of her engines, then is no longer navigating, and had they fixed the engines and gone underway again, they would have been navigating again?
> A:    Yes.
>
> Q:    All right. And so at that particular moment in time when there was no propulsion, it's your view that the vessel was no longer navigating.
> A:    Correct.

But when questioned further, Peace admitted that "trying to hold the position of a vessel is part of the navigational process" (Tr.[1] at 10).  He testified: (*id.* at 34–35):

> Q:   [A]re there times when, in the navigation of a vessel, the navigator of that vessel attempts to keep the vessel in as much a fixed or stationary position as possible, not counting, you know, wave movement, wind movement, or movement by other natural forces?
> A:   I think I understand.  Yes, you try to hold position.
>
> Q:   Okay. That can be a normal part of navigation?
> A:   Yes.
>
> Q:   So when you talk about navigation as deliberate action, it can be deliberate action in movement, as you've written here?
> A:   Correct.
>
> Q:   But it can also be deliberate action in maintenance of a fixed position?
> A:   Yes.

That is exactly what they were doing, albeit unsuccessfully.  When the engines began failing, Sebring deliberately dropped the anchor in an attempt to maintain the boat's position.  Just because the vessel was drifting, and then sinking, does not mean they stopped navigating.  In short, even if this Court considered the extrinsic evidence, and construed the Policy in Sebring's favor, ACE's "interpretation is *the only one* that can fairly be placed on the language in question."  *Perry v. Allstate Indem. Co.*, 953 F.3d 417, 421 (6th Cir. 2020) (citation omitted) (emphasis in original).

### *Effect of Breach*

A final point.  Sebring argues that even if the vessel was being navigated, violating the Captain's Warranty does not void the Policy entirely (Doc. 59 at 9–15).  In recent years, federal courts have come to agree with *Ciconett* -- holding that federal maritime law generally requires strict compliance with warranties.  "The federal rule, if one in fact exists, is that admiralty law

---

[1] The citation "Tr." refers to the draft transcript of the Hearing held December 6, 2023.

7

requires the strict construction of express warranties in marine insurance contracts; breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss." *Guam Indus. Servs., Inc. v. Zurich Am. Ins. Co.*, 787 F.3d 1001, 1004–05 (9th Cir. 2015) (citation omitted). *See also Great Lakes Ins. SE v. Sunset Watersports, Inc.*, 570 F. Supp. 3d 1252, 1270 (S.D. Fla. 2021) ("[T]he breach of a navigation limit warranty bars coverage as a matter of maritime law even when the breach is unrelated to the loss.") (quoting *Travelers Prop. Cas. Co. of Am.*, 996 F.3d at 1168).  This means, under federal law, failure to follow an express warranty voids a policy.  *See Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366 (11th Cir. 1988) ("[A]dmiralty law requires the strict construction of express warranties in marine insurance contracts; breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss.").

Other circuits have noted that "[t]here are sound policy reasons for strictly enforcing a captain's warranty in marine insurance."  *See Yu v. Albany Ins. Co.*, 281 F.3d 803, 810 (9th Cir. 2002).  Such a provision "permits the insurer to control the amount of risk it assumes, and the insured thereby to secure a reasonable premium."  *Id.*  To inject a causation requirement "would lead to uncertainty in determining the obligations of the parties, and would make coverage depend on highly hypothetical determinations of causation."  *Id.*  And thus, "it is not unreasonable to permit the parties to insert and enforce a strict captain's warranty in a marine insurance policy."  *Id.*

Applying Ohio law to this contract, the outcome is the same.  Through the Captain's Warranty -- explicitly incorporated into the contract -- Sebring agreed to have Captain Franklin at the helm on all *JudeSea* voyages.  This was a "warranty" under Ohio law -- not merely a "representation" made "to cause the insurer to assume the risk."  *Allstate Ins. Co. v. Boggs*, 27 Ohio

St. 2d 216, 219 (1971). "A warranty is a statement, description or undertaking by the insured of a material fact either appearing on the face of the policy or in another instrument specifically incorporated in the policy." *Id.* *See also Coffey v. Indiana Lumberman's Mut. Ins. Co.*, 372 F.2d 646, 648 (6th Cir. 1967) ("A warranty in insurance law is a statement or condition which forms a part of the contract whereby the insured agrees that certain acts have been or shall be done, and the validity of the contract depends upon the exact fulfilment of the condition."). Because ACE incorporated the Warranty "on the face of the [P]olicy," Sebring's violation voids coverage. *Boggs*, 27 Ohio St. 2d at 220. *See also Wisden v. Am. Ins. Co.*, 9 Ohio App. 2d 48, 49 (Ohio Ct. App. 1964) (noting that "nonfulfillment of an express warranty vitiates an insurance contract").

Sebring attempts to distinguish *Yu*, 281 F.3d 803, and similar cases cited by ACE, by pointing out that the policies in those cases contained explicit warnings that failure to follow a captain's warranty would void the policy (Doc. 59 at 9–10). But Sebring was no less aware in this case. Insurers routinely vet the credentials of proposed captains prior to issuing coverage. When Sebring procured the Policy, he acknowledged in writing that issuance of the Policy would be based on ACE's approval of Captain Franklin's credentials, which he was required to provide (Doc. 56-2 at 14–17). And the Policy itself stated it would be "void if you or any covered person has concealed, misrepresented, or omitted any material fact relating to this policy before or after a loss" (Doc. 56-1 at 31). *See Unencumbered Assets, Tr. v. Great Am. Ins. Co.*, 817 F. Supp. 2d 1014, 1028 (S.D. Ohio 2011) (finding the *Boggs* standard satisfied where the policy stated that "[i]n the event that any statement or representation in the Application is untrue, this Policy shall be *void and of no effect whatsoever*") (emphasis in original).

9

CONCLUSION

Under the plain language of the Policy, the *JudeSea* was "being navigated" throughout its final voyage -- when it left the dock, when its engines failed, and when it stuck the jetty.  A vessel's navigational status does not change simply because a mechanical malfunction occurs, resulting in a change of course.

When the allision occurred, the named captain was not "behind the wheel."  Sebring's failure to comply with the Captain's Warranty voids coverage.  As a result, ACE's Motion for Summary Judgment (Doc. 56) is granted; Sebring's Motion (Doc. 54) is denied.  All that remains are Sebring's claim against the Keenan insurance agency and its agent Bersnak.

IT IS SO ORDERED.

                                            *s/ Jack Zouhary*
                                          JACK ZOUHARY
                                          U. S. DISTRICT JUDGE

                                          February 6, 2024